IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 30, 2010

**KIMBERLY ANN ROSS v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Bedford County**
**No. 11699     Robert G. Crigler, Judge**

_____

**No. M2009-01139-CCA-R3-PC - Filed June 9, 2010**

_____

The Petitioner, Kimberly Ann Ross, appeals from the Bedford County Circuit Court's denial of post-conviction relief from her guilty plea to first degree murder and her life sentence. In her appeal, the Petitioner argues that she received ineffective assistance of counsel because trial counsel coerced her into pleading guilty to first degree murder and failed to adequately prepare her case, investigate witnesses, and defend her. She also contends that she was unable to make a knowing, voluntary, and intelligent decision to enter her guilty plea because she was under the influence of certain medications. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Emeterio R. Hernando, Lewisburg, Tennessee, for the Petitioner-Appellant, Kimberly Ann Ross.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; Charles Frank Crawford, Jr., District Attorney General; and Michael D. Randles, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**Guilty Plea Hearing.** At the guilty plea hearing on November 7, 2007, the trial court explained the terms of the plea agreement and extensively questioned the Petitioner before accepting her plea of guilty to first degree murder. During its questioning, the court asked the Petitioner if she had taken any medication that day:

| | |
|---|---|
| The Court: | Have you taken any medicine today, prescription or non-prescription? |
| The Petitioner: | Yes, Your Honor. |
| The Court: | The reason we ask this is to make sure you are clear minded and understand what you are doing and your judgment is not clouded by medicine or any other reason. Let me ask you what medicine you have taken today? |
| The Petitioner: | Coumadin, Pentasa, [Phenergan] for an upset stomach. Nothing to interfere with my mind. |
| The Court: | Coumadin is a blood thinner, I think. None of those things are affecting your ability [to think]. Is that your belief? |
| The Petitioner: | No. |
| The Court: | Have you taken any other kinds of drugs besides medicine? |
| The Petitioner: | No, Your Honor. |

The State then summarized the facts in the Petitioner's case:

Your Honor, in the early morning hours of February 14, 2007, William "Bill" Ross was shot three times as he lay asleep in his own home. In spite of the efforts of medical personnel, he died shortly thereafter as a result of these gunshot wounds.

For a number of weeks prior to Mr. Ross' murder his wife Kimberly Ross had repeatedly stated to other persons that her husband had to be killed.

She tried time and again to recruit persons to kill him or to arrange for his murder.

She mentioned that a good plan would include a faked home invasion with her being tied up but loosely enough to allow her to reach her cell phone so she could call 911.

-2-

Two of the people she attempted to get involved in this plan were Ashley Cook and Justin Young, younger people than Ms. Ross, who she had aided financially and over whom she exercised some influence.

Ms. Ross also tried to get at least one additional person, Megan Jones, to arrange for Mr. Ross' murder.

Ms. Jones was another person Ms. Ross had taken under her wing, so to speak, and had assisted financially and who was then requested to assist Ms. Ross in return.

On February [14], Ms. Ross had arranged with Ashley Cook and Justin Young for Mr. Ross to die. Justin Young was instructed to prepare the weapon, wiping down the gun and the ammunition.

Mr. Young did as he was instructed and racked one of the bullets in the chamber to be ready to fire. It would be his testimony at that time that Ms. Ross wiped down a final bullet and put it back into the clip so that the gun was fully loaded.

Young was to give the weapon to Ashley Cook when she arrived to commit the planned murder.

Cook was to come from her home by cab to the Ross residence. Young was to assist her in entering the home through the bedroom window by means of a ladder in keeping with the pretense of a home invasion.

Young was to give Cook cab fare for the trip there and keys to the Ross vehicle Cook was to use to leave after the killing and [to take] the murder weapon.

Cook was to shoot Mr. Ross as he slept in his bed, killing him before tying up Young and Ms. Ross to make it appear a home invasion had occurred.

Ms. Ross was then to call 911 after giving Cook time to get away in the Ross vehicle as planned.

Ms. Ross and Young were to pretend that two black men had entered the home when questioned by law enforcement.

Mr. Ross came home from work that evening, ate dinner and ultimately went to bed, which was consistent with his general routine.

Ms. Ross joined him in the bedroom for approximately 45 minutes before returning to the living room. She supervised Young's preparation of the pistol, as they had planned, in loading the final round into the gun herself. She had Young contact Cook by phone to make sure the plan was underway.

She arrived and the plan was followed and Bill Ross was shot three times by Ashley Cook.

Ms. Ross' home invasion ruse was believed tentatively by law enforcement but there were concerns from the outset. Ms. Ross and Mr. Young both gave three statements on that day.

By means of the excellent efforts of the Bedford County Sheriff[']s Department and the Tennessee Bureau of Investigation, the fact that Mr. Ross's murder was planned by his wife and carried out at her direction by Ashley Cook primarily and Justin Young secondarily was soon ferreted out.

Ms. Ross and Mr. Young initially gave statements denying culpability. Their initial statements were that two black men had been part of a home invasion. When inconsistencies in their stories were pointed out, they both then turned in statements incriminating Ms. Cook.

In the final statement, the third statement that day, among other things, Ms. Ross did say that I planned with Justin and Ashley for Ashley to come in through Justin's window and tie me and Justin up and shoot William; then she was going to take the car and gun and leave, which is exactly what happened.

A search warrant for Ms. Ashley Cook's home was obtained[,] and the murder weapon was found hidden there.

Expert ballistic testings reveal[ed] that the slugs from Mr. Ross' body and the shell casings found in his bedroom match[ed] the weapon and the bullets matched the weapon in Cook's possession. The vehicle Ms. Cook used to leave the Ross residence in accordance with the plan was found abandoned near Ms. Cook's home by the sheriff of Bedford County.

In our preparing for trial, Your Honor, we did discover that Justin Young would testify that . . . Ms. Ross had told him that if he helped her accomplish this, that she would take him with her to Oklahoma, provide a job for him, and a place for him to live[,] and we were considering asking this Court had this plea not been entered for a continuance to perhaps seek enhanced punishment.

When the trial court asked the Petitioner if this summary of the facts was what had happened, the Petitioner replied, "For the most part, yes, Your Honor." The Petitioner then acknowledged that the aforementioned facts were true and that she wished to enter a guilty plea to first degree murder through the theory of criminal responsibility. Trial counsel stated that the proposed plea agreement was that the Petitioner would plead guilty to first degree murder and would receive a sentence of life with the possibility of parole. As a part of this agreement, the State agreed to dismiss the charge against the Petitioner related to TENNCare fraud. Prior to accepting her guilty plea to first degree murder, the trial court asked the Petitioner the following questions:

| The Court: | In Bedford County Circuit Court case number 16257, what then is your plea to count 1, first degree murder; guilty or not guilty? |
|---|---|
| The Petitioner: | Guilty. |
| The Court: | Is that your free and voluntary decision? |
| The Petitioner: | Yes, Your Honor. |
| The Court: | Have you been promised anything other than what has been said here in court to get you to plea[d] guilty? |
| The Petitioner: | No, Your Honor. |
| The Court: | Have you been threatened in any way? |
| The Petitioner: | No, Your Honor. |
| The Court: | Do you understand that by pleading guilty there will be no further trial of any kind so that by pleading guilty you are waiving your right to trial, to [a] jury trial and to appeal? |

| | |
|---|---|
| The Petitioner: | Yes, Your Honor. |
| The Court: | Do you have any complaints about the way and manner in which [trial counsel and co-counsel] have represented you? |
| The Petitioner: | No, Your Honor. |
| The Court: | Have you had any difficulty communicating with them about your case? |
| The Petitioner: | No, Your Honor. |
| The Court: | Have you been able to speak with them all that you want to in order to do what you are doing today? |
| The Petitioner: | Yes, Your Honor. |
| The Court: | Is there anything they could have done to research or investigate the case that you can think of [that] they have not done? |
| The Petitioner: | No, Your Honor. |
| The Court: | Do you have any questions about anything that has been said or done in court today? |
| The Petitioner: | No, Your Honor. |

At the conclusion of the questions, the court stated, "I am going to find you are competent to enter this guilty plea; that you are doing this knowingly, understandingly and voluntarily and also making a finding there is a sufficient factual basis to accept the plea."

Prior to the conclusion of the hearing, trial counsel asked the Petitioner the following questions relating to his representation of her:

| | |
|---|---|
| Trial Counsel: | Ms. Ross, in the last several days there [have] been some rather dramatic events [that have] occur[ed] in this case; is that correct? |

The Petitioner: Yes.

Trial Counsel: Particularly Justin Young has been willing to testify and Ashley Cook, they filed notice and [the State] had them on the witness list.

The Petitioner: Yes.

Trial Counsel: We have furnished you with all of the written discovery the State has provided to us and it is contained in two bound folders. You have had a chance to look and read through that. It contains both the . . . narrative by Agent Wayne Wesson of your oral interview as well as Justin Young's interview as well as your two written statements, two written statements signed by you, correct?

The Petitioner: Yes.

Trial Counsel: Two written statements signed by Justin Young?

The Petitioner: Yes.

Trial Counsel: Two written statements signed by Ashley Cook?

The Petitioner: Yes.

Trial Counsel: You have looked through that[,] and we have talked about all of the different avenues and possible theories and strategy?

The Petitioner: Yes.

Trial Counsel: We have also discussed with you other facts that have not been disclosed by the State[,] but we have searched those out and informed you of those?

The Petitioner: Yes

| | |
|---|---|
| Trial Counsel: | Your decision to enter this deal is as a result of our investigation, what we have discovered and what the State has discovered; is that correct? |
| The Petitioner: | Yes. |
| Trial Counsel: | We have discussed that the district attorney general has some serious concerns that there are possible aggravating factors that could be filed to enhance this life sentence? |
| The Petitioner: | Yes. |
| Trial Counsel: | And you understand that? |
| The Petitioner: | Yes, I do. |
| Trial Counsel: | Knowing all of that, you still wish to enter this plea which is the maximum on count 1. |
| The Petitioner: | Yes. |
| Trial Counsel: | Is there anything you can think of that I or [co-counsel] could have done that we did not do? |
| The Petitioner: | No. |
| Trial Counsel: | Is there anything that we should have done that we didn't do? |
| The Petitioner: | No. |

The trial court accepted the Petitioner's guilty plea to first degree murder and sentenced her pursuant to the terms of the plea agreement to a life sentence.

**Post-Conviction Hearing.** At the post-conviction hearing, the Petitioner testified that she entered a guilty plea to first degree murder on November 7, 2007. She stated that prior to taking the witness stand to enter her guilty plea, she had never testified in court. The Petitioner said that she filed her pro se petition for post-conviction relief because she "ended up taking a plea that [she] was kind of coerced into taking." She also claimed she was on medicine at the time she entered her guilty plea. The Petitioner further claimed that trial

counsel provided ineffective assistance in failing to communicate with her because she had called him fourteen times and had contacted him by letter, and he only came to see her in jail four times. She said trial counsel visited her in early March to tell her that he was representing her. He also talked to her around April 9 for approximately an hour. Finally, she said that trial counsel visited her on November 5 and November 6, just before her trial date "to push the plea bargain." When asked how trial counsel failed to investigate or interview her case, the Petitioner explained:

> There could have been witnesses that he could have spoken to on my behalf; other situations, medical records that he could have obtained to help in my behalf.
>
> He could have made other phone calls to the other places I had been the weekend before in Franklin on my behalf.
>
> There . . . was a female that he could have contacted that would have [provided testimony] that one of the co-defendants had a grudge against [me].

The Petitioner claimed that she gave trial counsel a list of approximately five witnesses, including Kim Reese; members of the band 3-D Live; her son, Travis Galloway; Megan Jones; and Megan Jones's cousin. When asked if trial counsel interviewed these witnesses, she replied, "Not to my knowledge." The Petitioner said that trial counsel did not tell her what the nature of these witnesses' testimony would be. She also claimed that she "was on medications at the time that . . . the whole thing started[.]" She said that she was taking "Phenergan and Amitriptyline and Vistaril at the time of the signing of the plea." She claimed that if trial counsel would have investigated these witnesses and gathered her medical records, she could have made a better decision regarding whether to enter a guilty plea in her case.

The Petitioner also stated that trial counsel coerced her into pleading guilty. She said that trial counsel told her that the State was going "to file some charges against [her] family if [she] did not take the plea, and [were going to request] the death penalty [in her case] if [she] had not taken the plea." At the time, she told trial counsel that she did not want her family charged with anything, and she "didn't like the idea of [a sentence of] death."

The Petitioner claimed she erroneously told the trial court that the medications she was taking did not affect her mental state at the guilty plea hearing because she was "nervous and scared." She also said that she informed the court that she was content with trial counsel's representation at the hearing because "she figured it was all over." She said, "I

-9-

didn't know there was a chance to go on, because even during the plea, I tried to speak up and was not allowed to." She claimed that when the court asked her if she agreed with the State's summary of facts supporting the offense, she stated, "For the most part, yes, Your Honor." She later said that the State's summary of the facts was correct at the guilty plea hearing because she "was afraid."

The Petitioner also said that trial counsel prejudiced her case by disclosing confidential information to Young's attorney. She said that trial counsel asked Young's attorney if he knew that Young had been convicted as a juvenile of rape, which prejudiced her case "[b]ecause it brought out information that could have been used by our side to show what . . . might have been hidden by [Young] if not brought up to his own attorney because [Young] had not at that time told his own attorney [about the rape conviction]."

During cross-examination, the Petitioner acknowledged that her son, Travis Galloway, had been in the state's custody for a long period of time prior to the offense in this case. She also admitted that Megan Jones had testified against Ashley Cook at trial, which had resulted in Cook's conviction. The Petitioner acknowledged that her medications of Coumadin, a blood thinner, and Phernergan, for an upset stomach, did not affect her mental ability. In addition, she admitted that the only other drug she said she was taking at the guilty plea hearing was Pentasa. She claimed that she forgot to tell the court about the fact that she had also taken Amitriptyline and Vistaril because she "was kind of nervous and scared." She claimed that trial counsel had told her "to go along with everything that was said [regarding the plea]" She claimed she did not tell the trial court that she was taking medication that prevented her from understanding the consequences of her guilty plea because she "was afraid that the charges would be all turned back over and everything changed again and [her] family would be charged." The Petitioner acknowledged that trial counsel discussed the theory of criminal responsibility to her and explained that she could be charged with first degree murder even though she did not pull the trigger to kill her husband.

During re-direct examination, the Petitioner acknowledged that she would be given a new trial if her post-conviction petition was granted. She also admitted that the State could seek an enhanced punishment of life without the possibility of parole or the death penalty in her new trial. The Petitioner stated that she wished to proceed with her post-conviction petition, despite the possibility that she could be facing a sentence of life without parole or the death penalty if she were granted a new trial.

Trial counsel testified that he had practiced law in Tennessee for twenty-seven years. He stated that he was appointed to represent the Petitioner on her charges of first degree murder and conspiracy to commit first degree murder just after she was arrested. He also stated that a volunteer, unpaid attorney had been appointed by the court to sit as second-chair

counsel. Trial counsel said that he was qualified to represent clients in capital cases and had handled fifty-two first degree murder cases prior to representing the Petitioner. When asked about his communication with the Petitioner during her case, trial counsel stated:

> There [were] several meetings. I don't know the exact number. Every time we had a court date, I talked to her some then. I did talk to her some on the telephone. I do not know how many times.

> Ms. Ross' main complaint was that we weren't bringing her any good news. That was – there [were] no good facts.

He stated that he believed he had met with the Petitioner more than the four times she claimed. Trial counsel said that the last two or three times he met with her were very lengthy. He asserted that he had given the Petitioner all of the witnesses' statements and had given her a copy of all of the discovery provided by the State as well as "other documentation that [he and co-counsel] had obtained outside of what the State had provided." He explained:

> [The Petitioner] had all of that information, but with the decision by Mr. Young and Ms. Cook to testify, that dramatically changed the posture of the case. It also changed, evidently, the State's position about continuing on; that the day that we entered the plea, [an Assistant District Attorney] was there for the State, and he announced if [the Petitioner] was not going to accept a plea to life on first-degree murder, [the State was] going to ask the Judge to continue the trial, and they were going to seek and – or file an enhancement notice.

> I don't believe I ever told [the Petitioner] that this was a capital case, but it certainly could have been a life without parole case.

Trial counsel stated that the biggest problem he had with the Petitioner was that she did not believe she should be convicted of first degree murder because she did not pull the trigger. However, he said that the Petitioner "understood her role and her participation [in the murder], the planning of the killing, the planning of the alibi, and the follow-through after it was all over, [he thought] she realized she was guilty."

Trial counsel said that the Petitioner had told him to contact Kim Reese, the girl with whom Justin Young had fathered a child and who had later started dating the Petitioner's son, Travis Galloway. He stated that he tried to contact Kim Reese, but she refused to talk to him about the Petitioner's case. He said that he informed the Petitioner about Reese's refusal to talk to him. He also stated that he made contact with the band, 3-D Live: "[The Petitioner]

-11-

seemed to think that because she was at a band the week before her husband was killed, with her husband, that that would somehow show that she wasn't involved in his killing." Trial counsel told the Petitioner that they had talked to the band members and that their testimony had no bearing on her case. He told the Petitioner that with the anticipated testimony of Justin Young, Ashley Cook, and Megan Jones, "it would be an extremely difficult case to get anything other than a guilty verdict, in [his] opinion." Trial counsel said that he attempted to contact the Petitioner's son, Travis Galloway, but he refused to talk to trial counsel or anyone in trial counsel's office after he was interviewed by the sheriff's department. He also stated that he tried to speak with Megan Jones, but she declined to talk to him]. In addition, he stated that he "always make[s] an effort to contact each witness that the State gives [him] notice of." Trial counsel stated that Agent Wesson (of the Tennessee Bureau of Investigation) talked to him about the case as well as Terry Abner, an individual on the State's witness list, who came to his office to discuss the case three different times.

Trial counsel said that he did not observe anything about the Petitioner that indicated she was not coherent at the time of the guilty plea hearing. He said that the Petitioner never told him that she did not understand the consequences of her guilty plea. Moreover, trial counsel said that he had confirmed through the jail the medicine that the Petitioner was taking. He stated the following regarding the medicine that the Petitioner was taking at the time of the guilty plea hearing: "I was aware of the Coumadin. That's a blood thinner. The Phenergan, I believe she had taken the day before and that morning. I was unaware of any other medication that she was being prescribed." Trial counsel stated that he obtained the Petitioner's medical records regarding a hospital visit that she made the morning of her husband's murder. He stated that the Petitioner had told him to try to suppress all of her statements to Agent Wesson because she was "heavily medicated from the hospital [visit]" that day. When he obtained the pertinent medical records from that hospital visit as well as other medical records, they showed that the medicine that the Petitioner had been given would not "affect her ability to be . . . bright-eyed and bushy-tailed, clear-headed." Trial counsel stated that the Petitioner gave three statements to Agent Wesson and that "[e]ach one progressively implicated" the Petitioner. In the third statement, the Petitioner "implicated herself in the conspiracy to have [her husband] murdered." Trial counsel stated that he fully explored every possible defense in her case.

When asked about the Petitioner's claim that trial counsel told her that she would be charged with TENNCare fraud if she did not accept the plea agreement from the State, trial counsel said:

> [T]he State had . . . the TENNCare fraud investigated, and, in fact, a couple of days before we did the plea, came to the DA's office, and [the State was] getting ready to present that [case] to the grand jury, to indict [the Petitioner]

-12-

for TENNCare fraud, approximately $85[,000] or $86,000, and it might be revised upward.

As part of her pleading guilty to first-degree murder, there would be no TENNCare fraud indictment brought against her, nor would the State seek to try and obtain any of the proceeds or any of the property to try and make good on any claim of fraud on TENNCare. That was explained to her.

Regarding whether he had told the Petitioner that her family would be indicted for TENNCare fraud, trial counsel replied:

[I]t was never related to her that her parents would be indicted for a criminal act. What was related to her was that if the State was successful on the TENNCare fraud under the forfeiture conviction of the code, [the State] could seek to regain assets that she had disposed of.

These assets included a vehicle and other personal property that the Petitioner transferred to her parents worth at least $35,000 to $40,000. Trial counsel stated that the Petitioner's parents "were not involved in the TENNCare fraud" and "didn't know anything about it."

When asked about whether he disclosed confidential information about Justin Young's prior juvenile conviction for rape to Young's attorney, trial counsel said:

I don't believe that we did [disclose that information]. I can't imagine [Young's attorney] not knowing [that information]. I know [Young's attorney] fairly well. He usually knows the criminal history of his clients. I am sure a criminal history had been disclosed to him by the State in their Rule 16 discovery to him. I am pretty sure he probably knew about it.

He also added that even if he did disclose that information, it would not have mattered because he would have still been able to cross-examine Young about the fact that Travis Galloway, the Petitioner's son, was dating the girl that was the victim of the rape.

Trial counsel said that the Petitioner made the decision to plead guilty on her own. He said that if she had refused the plea agreement, then trial counsel would have been prepared to go to trial. He further stated that the Petitioner's decision to plead guilty three days prior to trial "was predicated primarily upon receiving notice that Justin Young and Ashley Cook were going to testify for the State." He said, "I felt confident that their testimony was going to be as outlined in their statements." Trial counsel stated that he and co-counsel were ready to go to trial, in the event that the Petitioner refused to take the plea

offer from the State and the trial court overruled the State's motion for a continuance. He said that he had the jury list and had been investigating the jurors to decide who he would want to sit on the jury.

On March 20, 2009, the trial court entered an order denying the Petitioner's request for post-conviction relief. The Petitioner filed a timely notice of appeal.

## ANALYSIS

The Petitioner specifically contends that trial counsel was ineffective because he coerced her into pleading guilty and failed to adequately prepare her case, investigate witnesses, and defend her. She also claims that her plea was not knowing and voluntary because she was under the influence of medicine that affected her ability to make decisions at the time she entered her plea of guilt. In response, the State argues that this court should affirm the denial of post-conviction relief because the Petitioner failed to prove her allegations of ineffective assistance of counsel and failed to prove that her guilty plea was not knowingly and voluntarily entered by clear and convincing evidence.

First, the Petitioner contends that she received ineffective assistance of counsel. Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103 (2006). The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal quotation and citations omitted). "The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence." Id. (citing T.C.A. § 40-30-110(f); Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006)). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901, n.3 (Tenn. 1992)), perm. to appeal denied (Tenn. Nov. 2, 1998).

Vaughn further repeated well-settled principles applicable to claims of ineffective assistance of counsel:

> The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

202 S.W.3d at 116 (internal quotations and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Id. (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697, 104 S. Ct. at 2069).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2065; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 370. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. (quoting Strickland, 466 U.S. at 694, 104 S. Ct. at 2068). In order to satisfy the "prejudice" requirement in the context of a guilty plea, a petitioner "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59, 106 S. Ct. 366, 370 (1985); see also Serrano v. State, 133 S.W.3d 599, 605 (Tenn. 2004).

We note that "[i]n evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999) (citing Strickland, 466 U.S. at 689, 104 S. Ct. at 2065). Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the

variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89, 104 S. Ct. at 2065.

The Petitioner specifically contends that trial counsel visited her to discuss her case only four times. She also claims that trial counsel failed to communicate with her despite several phone calls from her. She further claims that trial counsel failed to adequately investigate her case and failed to interview witnesses that may have been helpful to her case. This court has concluded that "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990), perm. to appeal denied (Tenn. July 2, 1990). The presentation of the witness at the post-conviction hearing is the only way for the petitioner to establish:

> (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case,
> (b) a known witness was not interviewed,
> (c) the failure to discover or interview a witness inured to his prejudice, or
> (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner.

Id. Although the Petitioner claims that trial counsel rendered ineffective assistance in failing to interview certain witnesses, we note that the Petitioner failed to present any of these witnesses at the post-conviction hearing. See Black, 794 S.W.2d at 757.

Second, the Petitioner claims that her plea was not knowing and voluntary because she was under the influence of medicine at the time that her plea was entered. When analyzing the validity of a guilty plea, we follow the federal landmark case of Boykin v. Alabama, 395 U.S. 238, 89 S. Ct. 1709 (1969), and the Tennessee landmark case of State v. Mackey, 553 S.W.2d 337 (Tenn. 1977), superseded on other grounds by rule as stated in State v. Wilson, 31 S.W.3d 189, 193 (Tenn. 2000). State v. Pettus, 986 S.W.2d 540, 542 (Tenn. 1999). In Boykin, the United States Supreme Court held that a trial court may not accept a guilty plea unless there is an affirmative showing that the guilty plea was "intelligent and voluntary." 395 U.S. at 242, 89 S. Ct. at 1711. When accepting a guilty plea, the trial court is responsible for "canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." Id. at 244, 89 S. Ct. at 1712. In Mackey, the Tennessee Supreme Court held that "the record of acceptance of a defendant's plea of guilty must affirmatively demonstrate that his decision was both voluntary and knowledgeable, i.e., that he has been made aware of the significant

-16-

consequences of such a plea; otherwise, it will not amount to an 'intentional abandonment of a known right.'" 553 S.W.2d at 340.

The Tennessee Supreme Court has emphasized that a plea is not voluntary if it is the result of "'[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats . . . .'" Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting Boykin, 395 U.S. at 242-43, 89 S. Ct. at 1712). A trial court must look at a number of circumstantial factors before determining whether a guilty plea is voluntary and intelligent. Id. These factors include "the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial." Id. (citing Caudill v. Jago, 747 F.2d 1046, 1052 (6th Cir. 1984)).

At the conclusion of the hearing, the trial court determined that the Petitioner's issue regarding trial counsel's failure to interview witnesses was without merit because the Petitioner failed to present any of these witnesses at the post-conviction hearing. It added that the Petitioner had supplied no proof that any of these witnesses would have provided "favorable evidence in her behalf." The court also found that the Petitioner had failed to prove that trial counsel rendered deficient representation. The court said that it accredited trial counsel's testimony that the State never threatened to charge the Petitioner's parents in the TENNCare fraud case and did not find the Petitioner's testimony on that issue to be credible. It also found that that the Petitioner's testimony was not credible regarding her claim that she did not feel free to "speak up" concerning the fact that she had taken mind-altering medicine, especially given the fact that she "volunteered" at the guilty plea hearing that she had not taken any medicine that interfered with her ability to make decisions. The court stated that the Petitioner's claim that that she simply forgot to tell the court about some of the medicines that she had taken prior to the hearing was also not credible. Further, it determined that the Petitioner had not offered any proof to support her claim that the medicines she was taking at the time of her guilty plea interfered with her ability to think clearly.

The trial court also considered the applicable factors in determining whether a defendant entered a knowing and voluntary guilty plea. First, the trial court found that although the Petitioner had no other experience with criminal proceedings, she was "a shrewd, calculating and intelligent defendant." He also found that the Petitioner was represented by competent counsel who met with her several times during her case and adequately discussed her options with her. Although the court acknowledged that "a plea to first-degree murder, taking a life sentence even with the possibility of parole, is a very

-17-

serious decision," it concluded that the fact that it was a serious decision did not mean that the Petitioner's decision was involuntary. It noted that the Petitioner was aware that the State would seek the death penalty or a sentence of life without the possibility of parole and that the State would prosecute her for the TENNCare fraud case if she refused to accept the plea agreement. Therefore, the court concluded that the Petitioner in this case pleaded guilty "to avoid a greater penalty" than she might receive in a jury trial. Ultimately, the court concluded that "her guilty plea was freely[,] voluntarily and understandably given."

Because the evidence does not preponderate against the findings of fact of the post-conviction court, this court is bound by those findings. We conclude that the Petitioner failed to prove by clear and convincing evidence that counsel provided ineffective assistance or that her guilty pleas were unknowing or involuntary. Accordingly, the Petitioner is not entitled to relief on this issue.

**Conclusion.** Upon review, we affirm the judgment of the post-conviction court.

_____
CAMILLE R. McMULLEN, JUDGE